# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SHARONNA NOELLE FORD** | : | |
| 23012 Columbia Place | : | |
| Landover, MD 20785 | : | |
|       Plaintiff, | : | |
| | : | |
|   v. | : | |
| | : | Civil Case No. _____ |
| **WILLIAMS, ADLEY & COMPANY – DC LPP** | : | |
| **AKAWILLIAMS, ADLEY & COMPANY– DC LLP** | : | |
| **AKA   WILLIAMS, ADLEY & COMPANY** | : | |
| | : | |
| 1030 15th Street, NW | : | |
| Suite 350 West | : | |
| Washington, DC 20005 | : | |
| | : | |
| | : | |
|       Defendant. | : | |

## COMPLAINT WITH JURY DEMAND

Plaintiff Sharonna Noelle Ford ("Ford"), by and through her undersigned counsel, hereby respectfully sets forth her complaint against Defendant Williams, Adley & Co.- DC LLP also known as Williams, Adley & Co.- DC, LLP and known as Williams Adley and Company (hereinafter "Williams Adley") for sexual harassment/sex discrimination, hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, as amended; as follows:

1.      Ford is a 36-year-old African American female resident of Maryland and was, between 2001 until April 15, 2014, employed by Williams Adley as a file maintenance technician.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction under 28 U.S.C. § 1331 because this case presents a question of federal law. Specifically, this Court has jurisdiction under 28 U.S.C. § 1331, 29 U.S.C. § 623, 42 U.S.C. §§ 2000e-2, 2000e-3 and 2000e-5, 12112 and 12117.

3.      Venue is proper under 42 U.S.C. § 1391(b) in that Defendant Williams Adley does business in and may be found in the District of Columbia.

4.      On or about March 11, 2014, Ford initiated contact with personnel in the Washington Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") and then made her claims of sexual harassment/sex discrimination and hostile work environment.

5.      Ford then timely filed her complaint with the EEOC which, on or about March 11, 2015, opened Charge No. 570-2014-00836.

6.      On or about March 14, 2014, Williams Adley received notice of the aforesaid EEOC complaint.

7.      On or about April 15, 2014, Williams Adley, with knowledge of the filing of the EEOC complaint, terminated Ford.

8.      Ford timely amended her charge to include retaliation for reporting the sexual harassment and hostile work environment to her supervisors at Williams Adley and retaliatory termination for filing the claim with the EEOC.

9. On or about September 29, 2017, EEOC issued a right-to-sue notice in the above captioned matter.

10. On or about December 27, 2017, Ford filed the instant case within 90 days of receiving the right-to-sue notice.

## FACTS

11. Ford was hired in 2001 as a full-time file maintenance technician at Williams Adley in Washington, D.C.

12. Until late 2007, Ford reported to female supervisors and she and her supervisors reported to Jocelyn Hill (hereinafter "Hill") who at all times relevant was a "supervisor" of Ford. While Ford may have had other people to whom she was required to report and was directed by, she was also, at all relevant times, required to report to Hill who reportedly was a part owner of and partner in Williams Adley and had the power to hire and or fire Ford.

13. At some point in late 2007, Hill hired Michael Liverpool (hereinafter "Liverpool") as the Team Leader of the File Maintenance Division, the division in which Ford worked. Hill directed Ford to report to and take directives from Liverpool. Ford was also required to have Liverpool sign her time sheets.

14. Soon after Liverpool was designated as Ford's "Team Leader," he began subjecting her to frequent, persistent, severe and pervasive sexual harassment, including sexually explicit, inappropriate comments, advances, touching, and other inappropriate behavior.

15. These harassing behaviors by Liverpool including sexually offensive comments – often made in front of other workers -- sexual gestures, sharing of allegedly autobiographical accounts of his sex life with others including previous a co-worker, his showing her and others in

the office photographs of naked women, his frequent very hard slapping on the underside of Ford's buttocks near her genitals,  his frequent requests that she "suck his dick" and or have sex with him, his statements that Ford could only receive time off in exchange for accommodating him sexually, his requests that she accept money for accommodating him sexually and asking Ford to call him "Big Daddy."

16.     Liverpool also told Ford that she should accommodate him and not report his sexual advances under the direct and implied threat that he would report a pre-2000 criminal conviction that Ford had earlier disclosed to him before he was her supervisor. Liverpool implied that she would lose her job if a background check were performed on her and therefore was blackmailing her to remain silent in an attempt to procure her compliance with his sexual requests.

17.     At some time in early 2008 Ford reported Liverpool's unwanted sexual advances to Hill in a telephone call. Hill told Ford to come to her office that day, whereupon she took Ford into the office of Shirley Nelson (hereinafter "Nelson") who was the Human Resources officer at that time.

18.     Ford then told Hill and Nelson about Liverpool's inappropriate behavior, including those behaviors set out in Paragraph 15.

19.     Hill and Nelson responded by asking Ford what she wanted them to do, whereupon Ford responded that she wanted Liverpool to be fired or at least removed from her work area and that she not be responsible for reporting to him.

20.     Hill and Nelson then directed that Ford return to her office and write down the specifics of her allegations and return the next day for a second meeting. Ford offered to send

them an email promptly and they responded that she was not to email the allegations, but write it and sign it in her own hand.

21.     The following day Ford reported to Nelson's office where Nelson and Hill were waiting for her. Ford handed Nelson a piece of lined white paper on which she had written her allegations. Ford told Nelson and Hill that the situation with Liverpool was very traumatic and upsetting to her and that she could not work under these conditions.

22.     Hill and Nelson read the complaint and then Hill tore the complaint to shreds and threw it in the trash can in the office. Hill and Nelson then told Ford that they had met with Liverpool and that he had admitted that he had repeatedly slapped Ford on the buttocks and made requests for sex but said that he was just joking.

23.     Hill and Nelson then instructed Ford to re-write and sign the complaint containing her allegations, but this time to leave out any sexually explicit language and any allegations of physical touching. They further directed Ford to write that she did not want Liverpool fired and that, while Liverpool's comments were not appropriate, she did not take them seriously and that she knew he was not serious.

24.     Following that meeting, for approximately four months, Liverpool was removed from Ford's work area.

25.     Approximately four months later, in the Summer of 2009, Liverpool was moved back into Ford's office/workspace. Ford, upset at having work with Liverpool again, approached Ms. Shay (unrecalled last name), a Human Resource Director for Walker and Company, a partnering entity with Williams Adley that shared adjacent office space.  Ford told Ms. Shay what had been occurring and that she was suffering stress from having to work with Liverpool.

26.     Approximately two days later, Hill telephoned Ford and, while screaming at Ford, told Ford that she was not to tell anybody about the harassment that had occurred and that it was a crime to do so and that she would be fired if it ever happened again.

27.     Hill then directed Ford to report to Nelson's office where Hill told Ford in Nelson's presence that Williams Adley was considering firing Ford. Hill instructed Ford not to mention the harassment issue again or tell anyone about it or Ford would be immediately terminated.  Hill said Williams Adley could be sued by Liverpool for exposing the incident.

28.     This conversation traumatized, emotionally upset and chastened Ford. As a result, she did not complain about Liverpool's behavior for several years.

29.     Liverpool, having moved back into his former office space shared with Ford gradually resumed his sexually offensive comments, gestures, advances, and touching as described in paragraph 15 above.

30.     At end of 2009, Ms. Chapel Wilson (hereinafter "Wilson") was installed by Hill as manager over Liverpool, who was then Team Lead over Ford. Wilson would periodically work in a cubicle across from the open door of the office where Liverpool and Ford worked.

31.     At some point in early 2011, while seated in the adjacent area, Wilson visually observed Liverpool slap Ford on her rear as Ford was walking past Liverpool's desk to take files to the nearby file room.

32.     Wilson, having seen the aforementioned slap from her work area across the hall approximately 10 feet away, immediately sent Ford a text message inquiring, "Did I just see Liverpool touch your butt?" Ford texted her back requesting that Wilson not say anything,

stating that it has been going on for a long time and, that she (Ford) could be fired if Wilson said anything about it.

33.     Wilson responded in a text requesting that Ford meet Wilson for lunch that day at the Marriott to discuss the matter.

34.     Wilson and Ford went to lunch that day at a restaurant in the Marriott Hotel. Ford told Wilson that she had reported previous incidents to Hill and Nelson and that they had threatened to fire her if she spoke of it again.

35.     Ford cried during the conversation with Wilson, stating that she was afraid that she would be fired if the matter were pursued.

36.     Wilson assured Ford that she would not be fired, and that Wilson was required to report the incident.

37.     The next day, Hill telephoned Ford and told her to report immediately to the Hill's office, which Ford did.

38.     When Ford arrived at Hill's office, Nelson was there, and Hill started the meeting by saying, "didn't I tell you that you would be fired if you told anyone else about this." Ford responded that she had not told anybody about it, but that Wilson had seen Liverpool slap her rear.

39.     Hill said that Ford had a gag order and that she was not to discuss this issue with anyone.

40.     Nelson then asked Ford if Liverpool was still touching Ford and Ford said he was.

41.     Nelson then told Ford to write a statement of what was going on and that she would be conducting another investigation and would contact Ford within a week. Hill then told Ford that writing a statement wouldn't be necessary.

42.     Hill then told Ford to go back to her desk and continue working until she, Hill, got back to her.

43.     Approximately two weeks later, Hill called Ford and told Ford that she would have to take a background check in order to remain on the contract. Ford, having been led by Hill to believe that she would then be fired, begged Hill to not make her take the background check.

44.     Hill then said to Ford that she (Hill) had "let you get away with it long enough."

45.     Approximately two weeks later, Wilson approached Ford at her desk and placed papers on Ford's desk directing that Ford fill them out. The papers required information on whether Ford had ever been convicted of a criminal offense.

46.     Ford then telephoned Hill and stated that she felt like this was retaliation and pled with Hill to relent. Hill responded that she would call her back.

47.     Hill never called Ford back. Ford was never required to fill out the papers.

48.     Approximately two weeks after Ford was given the background papers to fill out, Wilson informed Ford that she had previously thought that she was on track to make partner at Williams Adley, but that as a result of the incident with Ford and the resultant conflict with Hill and Nelson, that plan was no long possible and that she (Wilson) would therefore be leaving the firm.

49.     Wilson made it clear that she partially blamed Ford for this course of events but also made it clear that what was going on at Williams Adley, i.e. the harassment cover-up, was wrong.  Soon thereafter, by approximately mid-2011, Wilson resigned.

50.     At this point, the harassment by Liverpool abated for several months but began again and, by summer of 2011, had resumed in full.

51.     At some point in 2012, Hill hired Raymond Washington (hereinafter "Washington") as Project Manager to replace Wilson. Hill also hired Jacklyn Hair (hereinafter "Hair") to head Human Resources to replace Nelson.

52.     For the rest of 2012 Liverpool continued to harass Ford.  His behavior continued to include sexually offensive comments, sexual gestures, sharing of allegedly autobiographical accounts of his sex life, his frequent very hard slapping on the underside of Ford's buttocks near her genitals and his frequent requests that she perform sex acts with him.

53.     Ford, having been repeatedly threatened and having seen those trying to investigate the matter or discipline Liverpool forced out from Williams Adley, was scared into remaining silent but was suffering profound psychological distress.

54.     During 2013 Liverpool's verbal harassment of Ford and inappropriate comments continued unabated as exemplified by Liverpool's statement to Tremaine Wade in Ford's presence in June of 2013 that he knew that Ford wore thongs all summer long.

55.     In July 2013 Ford asked Liverpool where to place certain claims files. Liverpool, in the presence of several coworkers, responded "you can put it right there" and then pointed to his crotch.

56.     Liverpool also regularly commented on Ford's looks, body, and clothes. For example, in late July 2013, Liverpool told Ford to stand up and turn around, and then said, "it looks like your butt is getting big; what have you been doing to it?"

57.     Again, in August of 2013, Ford asked Liverpool where to place a file label on a box, and he responded, "I've got somewhere for you to put that label" and again pointed to his crotch.

58.     In late September 2013, Ford renewed her complaints to Hill about Liverpool's harassing her by requesting that the new person that was to be hired to be a female because Ford explained to Hill, that might make it more comfortable to work around Liverpool who was still harassing her.

59.     Hill did not verbally respond to this request but instead silently and angrily stared at Ford and from then on launched a coordinated and concerted effort to oust Ford.

60.     In response to Ford's renewed complaints about Liverpool, and in an attempt to intimidate Ford into silence, in early October 2014, Hill announced, at the end of a department meeting she called at Carmen's Restaurant in Washington D.C., that "everyone, repeat everyone," had to get a security clearance.

61.     This was an attempt to intimidate Ford. No one, in fact, was placed through a security clearance process after that meeting, but after the meeting Ford received a text message from Washington stating, "did you see the look on Sharonna's face" when "security clearance" was raised.

62.     At a meeting in October 2013, Liverpool said to his team in Ford's presence, "when Sharonna first started working here about l0 years ago, she was very skinny with big old titties."

63.     In November 2013, Liverpool told Ford that she should get with an old man like him because "old men like me have small dicks and know how to work it." He said, "I have a small dick, but it's not about the size, it's how you work it."

64.     Also in November, Liverpool said to Ford "I know you ate good for Thanksgiving because your butt looks big." He said, "it looks like your butt is getting big; did you have surgery on your butt?"

65.     At the end of December 2013, Liverpool again regaled Ford and the other employees on their team how he used to have sex with his old supervisor, Rhonda, in his office. Liverpool retold Ford and her co-workers, "she (Rhonda) used to suck my dick under the table, and you (Ford) would walk in and disturb us, so you (Ford) owe me."  Liverpool then stated that Rhonda was good at oral sex. and he said, "l used to have it so good."

66.     In early January 2014, Liverpool walked up behind Ford while she was using the Del Tek sign- in log, as if to pass by her, but paused instead and brushed against her rear.

67.     In late January 2014, while Ford was checking a file in a cabinet in the file room at another location, Liverpool approached Ford from behind and rubbed his crotch against her, this time moving his groin firmly from side to side against the center/indentation of Ford's buttocks.

68.     In early February 2014, Ford requested to leave work early and Liverpool responded, "you can only leave early if you go in the back room and suck my dick."

69.     After Liverpool declined to give permission, Washington also declined to give permission for Ford to leave work early.

70.     In response to Ford's September 2013 complaint to Hill of Liverpool's continuing harassment of Ford, Hill and Washington worked together to exacerbate the hostile work environment for Ford by failing to investigate her complaints and or take corrective action, by threatening her psychologically with firing via a background check in the October 2014 meeting, by Washington emailing her about her looking scared, by Washington sending her an email in January 17, 2014 with an application for a job cleaning trolleys, and finally by directing, permitting and excusing a series of physical attacks upon her by a coworker once in January 2014 and twice in February 2014.

71.     The attacks were carried out by Adeniyi Fawehinmi, (hereinafter "Ade"). In the first attack in late January 2014, Ade approached Ford as she was entering the team office, walking toward her cubicle, when Ade suddenly stood up and walked fast towards Ford and lunged his right shoulder into Ford's left shoulder.  Immediately after he hit Ford, Ade growled repeatedly and audibly at Ford so as to ensure that she knew his hostile intent. This happened two more times in February and after the third attack Ford complained to Hill in late February.

72.     Hill responded by calling a meeting for March 7, 2014 with Ade, Hair, Washington and Ford.  Ford provided three emails containing three eyewitness accounts of the attacks by Ade.  Hill glanced quickly at the emails without thoroughly reading any of them.

73.     Hill then listened to Ford's accusations, looking impatient, while distinctly uninterested and then listened patiently and carefully to Ade's explanation that he "just walks fast." Washington stated that he didn't believe that Ade attacked Ford at all, but that these

accusations were falsely created or exaggerated because Ford was jealous of Ade and his relationship with Washington.

74.     Washington admitted that he was biased on Ade's behalf as he was a close personal friend and neighbor of Ade. Despite the fact that Washington had not seen the alleged attacks and that there were three other witnesses to the attacks, the witnesses were not interviewed.

75.     At the end of the meeting, Hill dismissed Ade and told Ford, in front of Washington and Hair, that she agreed with Washington that Ford was jealous of his relationship with Ade, and that Ford was spending too much time on the phone and the Internet and not getting her work done. Hill decided that Ford's computer and internet access was to be taken away the following day.

76.     Hill also falsely said that Liverpool stated that Ford was not completing her work on time because of her focus on the Washington- Ade relationship.

77.     Ford denied the allegations, stating she was getting her work done on time and was not jealous of Ade. She asserted that the actions taken by Hill and Washington were unfair because she was the victim and, yet, she was being punished for having raised her concerns.

78.     Later that same day Ford provided Hill a copy of an email from Liverpool stating that Ford had completed her work in a timely manner and that she was diligent.

79.     Nevertheless, Hill refused to change her position and the following day Washington took Ford's computer and telephone away. As a result of this action, Ford's only remaining duty thereafter was to do Liverpool's filing.

80.     On March 8, 2014, Ford, Liverpool, and others including Hill were in the office on a Saturday looking for missing files when Liverpool again told Ford to call him "Big Daddy." Hill overheard this and expressed her distaste for it to Ford by saying, "eww gross."

81.     On March 12, 2014 Ford contacted the Washington Field Office of the U.S. Equal Employment Opportunity Commission and made a complaint.

82.      On March 14, 2014 the EEOC contacted Williams Adley about Ford's complaint.

83.     On or about March 24, 2014 Hill called Ford to a meeting with Hill and Hair wherein she asked Ford why she went to the EEOC.

84.      Ford said that she did so because Liverpool, Ade and Washington were harassing her, and Hill and Hair were not doing anything about her complaints.

85.     Hill and Hair did not ask Ford anything about her complaint but did say that an investigation would be undertaken and to not to discuss the matter with anyone.

86.      Hill told Ford that she should not gone to the EEOC.

87.     Ford then asked Hill and Hair to remove Liverpool and Hill responded, "No" and that the EEOC said they did not have to do that.

88.     This meeting and the denial of her request to have Liverpool removed created increased anxiety and depression in Ford. On March 25, 2014, Ford went see a doctor at the Metro Immediate Care for depression, anxiety, and sleep loss. She was seen by a doctor and given a prescription for antidepressants and a prescription order that Ford take nine days off work and to return for further medical evaluation on April 3, 2014.

89.     On or about March 26, 2014 Ford showed her supervisor, Washington, the note/prescription for time off and asked for leave, whereupon Washington said that she could not have the time off.

90.     Ford therefore took the medication prescribed but reported to work as ordered.

91.     At the end of March 2014, Ford went to Hair again and asked her to remove Liverpool from her work area and to restore her computer and telephone. This request was denied.

92.     Within a few days after this refusal, Ford contacted the EEOC investigator and complained that Liverpool was still in her work area. The investigator, at Ford's request, contacted Hair who, in response, on or about the first week in April 2014, removed Liverpool from Ford's work area but still did not restore Ford her computer or phone.

93.     After that Washington stopped communicating with Ford.

94.     On April 3, 2014 Ford went to the doctor at Metro Immediate Care who prescribed leave from work until April 17, 2014.

95.     At that time, Liverpool was still bringing Ford her limited work, but from a different room, and Ford was, for the most part, isolated and underutilized.

96.     On April 14, 2014 at 9:15 a.m. Ford requested a meeting with the managing partner of Williams Adley, Kola Isiaq (hereinafter "Isiaq") and met with him at about 9:30 a.m.

97.     Ford then explained what had been happening to Isiaq including that she was not to be at work at this time per doctor's orders.  Isiaq said he would look into it.

98.     Ford then went back to her desk at about 10:00 a.m. and stayed there until about 12:30 p.m. During this time no work was brought to her.

99.     Ford left work at about 12:30 p.m. per her doctor's orders.

100.     On April 16, 2014 Ford called Hair to report her medical situation. During the conversation Hair informed Ford that she had been terminated on April 15, 2014.

101.     After her termination by Williams Adley, Ford sought employment but, to date, has not been able to obtain any employment.

102.     At the time of her termination Ford was making approximately $49,000.00 per year plus benefits including substantial profit sharing.

103.     As a result of her treatment by Williams Adley and its employees, Ford suffered severe and continuing psychological distress which has continued to this day.

104.     As a result of her treatment by Williams Adley and its employees, Ford has incurred significant medical bills.

## COUNT I

### (Sexual Harassment/Sex Discrimination)

105.     Paragraphs 1 through 104 are incorporated by reference as if fully set forth herein.

106.     During the 300-day period prior to the filing of the EEOC Complaint, Ford was subjected to discrete and specific instances of sexual harassment in the workplace as set forth above.

107.     To the extent that such actions of sexual harassment were not undertaken by Ford's supervisors but by coworkers, Williams Adley was aware that the sexual harassment was occurring and took no sufficient steps to stop it. Williams Adley knew or should have known of the harassment and failed to implement prompt and appropriate corrective action.

108.     Williams Adley maliciously, willfully, and intentionally allowed its employees, including Ford's supervisors and co-workers, s to discriminate against Ford on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 et seq., by engaging in sexual harassment that was so severe and pervasive as to alter the conditions of Ford's employment and create an abusive working environment.

109.     As a direct and proximate result of Williams Adley's malicious, willful, and intentional sex discrimination against Ford, Ford suffered financial damage, injury to her reputation, diminution of her duties and responsibilities, and emotional pain and distress, lost income, lost income earning capacity and severe depression. She has also incurred attorney's fees.

WHEREFORE, Ford seeks judgment against Williams Adley under Count I of the Complaint for the following relief:

A) Compensatory damages of at least $300,000, the exact amount to be determined at trial;

B) Punitive damages of at least $300,000, the exact amount to be determined at trial;

C) Back pay in the amount of approximately $190,000.00;

D) Front pay in the amount to be determined by the court but not less than $50,000.00;

E) Her reasonable attorney's fees and costs;

F) Pre-judgment and post-judgment interest; and

G) Such other and further relief as the Court deems proper.

## COUNT II

### (Hostile Work Environment)

110.    Paragraphs 1 through 104 are incorporated by reference as if fully set forth herein.

111.    During the 300-day period prior to the filing of the EEOC Complaint, Ford was subjected to a hostile work environment as set forth above. The work environment was permeated with discriminatory intimidation, ridicule, and insult.

112.    The actions during the 300-day period prior to the filing of the EEOC Complaint were part of long series of serial violations involving a number of similar discriminatory acts which occurred over a series of years and are set forth in the Complaint. These acts were part of a related series of events which created a work environment permeated with discriminatory intimidation, ridicule, insult, and threat.

113.    To the extent that the actions which created the hostile work environment were not undertaken by Ford's supervisors but by coworkers, Williams Adley was aware that the hostile work environment existed and took no sufficient steps to stop it. Williams Adley knew or should have known of the harassment and failed to implement prompt and appropriate corrective action.

114.    Ford was a member of a protected class; she was subjected to unwelcome harassment; the harassment occurred because of her protected status; and the harassment had the effect of unreasonably interfering with hers work performance and creating an intimidating, hostile, or offensive working environment.

115.     Williams Adley maliciously, willfully, and intentionally allowed its employees, including Ford's supervisors and co-workers, to discriminate against Ford on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 et seq., by creating a hostile environment based on sexual harassment that was so severe and pervasive as to alter the conditions of Ford's employment and create an abusive working environment.

116.     As a direct and proximate result of Williams Adley's malicious, willful, and intentional sex discrimination against Ford, Ford suffered financial damage, injury to her reputation, diminution of her duties and responsibilities, emotional pain and distress, lost income, lost income earning capacity and severe depression. She has also incurred attorney's fees.

WHEREFORE, Ford seeks judgment against Williams Adley under Count II of the Complaint for the following relief:

A) Compensatory damages of at least $300,000, the exact amount to be determined at trial;

B) Punitive damages of at least $300,000, the exact amount to be determined at trial;

C) Back pay in the amount of approximately $190,000.00;

D) Front pay in the amount to be determined by the court but not less than $50,000.00;

E) Her reasonable attorney's fees and costs;

F) Pre-judgment and post-judgment interest; and

G) Such other and further relief as the Court deems proper.

## COUNT III

### (Employment Retaliation)

117.     Paragraphs 1 through 104 are incorporated by reference as if fully set forth herein.

118.     Ford's making of complaints about sexual harassment and hostile work environment to her supervisors at Williams Adley and to the EEOC were protected activities under Title VII.

119.     Ford opposed a practice made unlawful by Title VII; Williams Adley took a materially adverse action against her; and Williams Adley took the action "because" the Ford opposed the practice

120.     Williams Adley maliciously, willfully, and intentionally retaliated against Ford for filing EEO charges of sexual harassment/sex discrimination, and employment retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 et seq., by, *inter alia*, terminating her employment after she filed a complaint with the EEOC.

121.     Williams Adley also maliciously, willfully, and intentionally retaliated against Ford for bringing claims of sexual harassment/sex discrimination to her supervisors and the Williams Adley HR officers in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 et seq.

122.     As a direct and proximate result of the Williams Adley's malicious, willful intentional hostile actions against Ford, Ford suffered materially adverse actions that well might dissuade a reasonable worker from making or supporting a charge of discrimination.

123.     As a direct and proximate result of the malicious, willful, and intentional retaliation by the Williams Adley, Ford has suffered financial damage, injury to her reputation, diminution of her duties and responsibilities, and emotional pain and distress, lost past and potential income, medical expenses, and lost income. She has also incurred attorney's fees.

WHEREFORE, Ford seeks judgment against the Williams Adley under Count III of the Complaint for the following relief:

A) Compensatory damages of at least $300,000, the exact amount to be determined at trial;

B) Punitive damages of at least $300,000, the exact amount to be determined at trial;

C) Back pay in the amount of approximately $190,000.00;

D) Front pay in the amount to be determined by the court but not less than $50,000.00;

E) Her reasonable attorney's fees and costs;

F) Pre-judgment and post-judgment interest; and

G) Such other and further relief as the Court deems proper.

## Jury Demand

**Ford demands a jury trial on all counts triable by a jury.**

Respectfully Submitted:

  /s/ Sean W. O'Connell_____
Sean W. O'Connell, Esquire

D.C. Bar No. 413266
4113 Lee Highway
Arlington, VA 2220
Tel: (703)-558-0000
Fax: (703) 522-0765
*Co-Counsel for Plaintiff*
swoesq@yahoo.com


___/s/ David Charles Masselli_____
David Charles Masselli, Esquire
D.C. Bar No. 193276
4113 Lee Highway
Arlington, VA 2220
Tel: (703)-741-0420
Fax: (703) 7410979
*Co-Counsel for Plaintiff*
dm@mllaw.com